AT ROANOKE, VA
FILED

OCT 30 2009

JOHN F. CORCORAN, CLERK
BY:
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| SCOTT A. STICKLEY, | ) | Civil Action No. 5:09cv00004 |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| v. | ) | |
| | ) | |
| TIM SUTHERLY, et al., | ) | By: Samuel G. Wilson |
| Defendants. | ) | United States District Judge |

This is an action pursuant to 42 U.S.C. § 1983 by plaintiff, Scott A. Stickley, who was formerly employed as a police officer for the Town of Strasburg, Virginia ("the Town"), against defendants, the Town, its Chief of Police, Tim Sutherly, and the Town Manager, Kevin Fauber. Stickley claims that defendants terminated his employment in violation of the First and Fourteenth Amendments in retaliation for speaking on a matter of public concern. All three defendants have moved for summary judgment, maintaining that Stickley did not speak on a matter of public concern, but only as an employee on a matter of personal interest, and that his speech was therefore not protected. Alternatively, Sutherly and Fauber maintain that they have qualified immunity because they did not violate clearly established federal law, and the Town maintains that neither Sutherly nor Fauber had the final policymaking authority necessary to subject it to liability under § 1983 for the decision to terminate Stickley. The court finds that whether the content, form, and context of Stickley's speech is sufficient to position it as protected speech is at least debatable. Accordingly, the court finds that Sutherly and Fauber have qualified immunity and grants them summary judgment. The court also finds that neither Sutherly nor Fauber had the final policymaking authority necessary to subject the Town to

liability under §1983 for the single decision to terminate Stickley and therefore grants the Town summary judgment as well.

## I.

Stickley was a non-probationary officer in the Strasburg Police Department. In late 2006, Stickley and another Strasburg officer, Christopher Bodkin, interviewed for the office of Chief of Police, but the Town ultimately selected Tim Sutherly. In early 2007, shortly after Sutherly began as Chief, rumors began spreading in Strasburg that Sutherly wanted to terminate Stickley.

In July 2007, after charging Stickley with various infractions, Sutherly placed him on administrative leave, and requested a written response.[1] When Stickley responded, Sutherly met with him and told him he could either resign or accept a demotion from Lieutenant to School Resources Officer ("SRO"), a position equal to that of a Patrol Officer, and waive his right to grieve that demotion. Stickley refused to resign, and Sutherly informally demoted him to SRO. Sutherly then issued a written reprimand setting forth Stickley's violations, and informing Stickley of his right to appeal to the Town Manger. No "punitive penalty" accompanied these violations, but Stickley lost his ability to schedule officers for patrol as well as his "take home" vehicle privileges. Stickley appealed to the Town Manger, Kevin Fauber, and Sutherly then held a meeting with Fauber and Stickley. Fauber affirmed the reprimand in writing.

Around this same time, the Northern Virginia Daily, the local newspaper, published an article entitled <u>Discipline of Officers Puts Heat on Chief</u>. The article, in which Sutherly was quoted, reported on his July 2007, personnel decisions, including Stickley's demotion and the firing of Officer Bodkin. A letter to the editor also addressed these actions and called for "full

---

[1] About this same time, Officer Bodkin was fired by Sutherly.

disclosure and an open dialogue" about the personnel decisions at the police department. Stickley began to hear rumors in the community regarding his own employment status and contends that he was approached over fifty times during the course of the next year to discuss his demotion and eventual termination. In August 2007, Sarah Mauck, a member of the Town Council, reported to Sutherly that she had received a citizen complaint about Stickley's treatment. In November 2007, the newspaper again reported on Sutherly's personnel practices, including more of Sutherly's comments.

Several months later, on May 29, 2008, with the school year ending, Sutherly formalized Stickley's July 2007 demotion from Lieutenant. He assigned Stickley to Patrol Officer duty while school was not in session and stripped him of his title. He further advised Stickley that he could not file a grievance. On June 3, 2008, a concerned citizen, Margaret Bromley, came to the police station and complained to Sutherly about Stickley's demotion. Stickley had not personally told her about the situation, but she apparently learned of it from Stickley's girlfriend. The next day, Carl Rinker, a Town Council member, called Sutherly and also complained about the demotion. Rinker had learned of the demotion from an independent source, but had then approached Stickley to talk about it. During Rinker's conversation with Stickley, Stickley confirmed that he had been demoted, and expressed his dissatisfaction with it. He told Rinker that Sutherly was "taking [his] bars and that [he] was going to be on the road . . . under the supervision of people that [he] had been supervising for years." (Stickley Dep. 37.) He also stated his belief that he was being demoted to make room for another individual, and alluded to the fact that he was considering legal action. Stickley also requested that Rinker not attempt to intervene on his behalf.

In response to the phone call from Rinker, Sutherly placed Stickley on administrative leave and charged him with two infractions of the police department's internal policy manual:[2] taking an "action which [would] impair the efficiency or reputation of the department, its members, or employees" and committing "[i]nsubordination or serious breach of discipline."[3] Sutherly has stated that Stickley was placed on leave based entirely on the Bromely conversation and the Rinker phone call, because Stickley was "going over [his] head to a town council member . . . ." (Sutherly Dep. 64.) The memorandum placing Stickley on leave alleged that Stickley went "outside of the chain of command with departmental issues." (June 4, 2008, Memo.) Sutherly invited Stickley to respond by June 11, 2008, and threatened to take action if Stickley discussed the matter outside his official investigation.

Stickley submitted a written response on June 11, 2008, and later that day Sutherly tape recorded an interview with Stickley. During the interview Stickley admitted to talking to Councilman Rinker about his demotion, but he denied speaking badly about the police department. Sutherly demanded that Stickley either submit to a polygraph examination or execute a form refusing to sit for such an examination. When Stickley refused to do either without consulting his attorney, Sutherly informed him that he would consult with a Board of Inquiry, an advisory panel utilized at the discretion of the Chief of Police to investigate

---

[2] "The Strasburg Police Department Policy Manual was not adopted, ratified, or amended by the Strasburg Town Council." (Joint Stipulation at ¶ 3.) It is an internal document of the Strasburg police department.

[3] According to department rules and regulations, these infractions were serious enough to warrant dismissal.

disciplinary matters.[4] Later that afternoon, Sutherly informed Stickley that the Board of Inquiry would be meeting the following morning, to which Stickley responded that his attorney was unable to attend at that time. The Board consisted of Sutherly, Fauber, and Captain Furr, an officer from a neighboring jurisdiction. Stickley did not attend the meeting. In a memorandum dated June 20, 2008, Sutherly informed Stickley that the Board unanimously recommended termination of Stickley's employment due to the two infractions charged in the June 4, 2008 memorandum. The termination was based on the same reasons given for his suspension – "the conversation with Councilman Rinker." (Sutherly Dep. 79.)

Stickley had the option of filing a formal grievance challenging his dismissal pursuant to the Town's personnel policy manual which the Town Council formally adopted as official Town policy (see Strasburg Code § 62-1) in conformity with the requirements of Virginia law (see Joint Stipulation at ¶ 1-2). In the case of a termination like Stickley's, the Town's grievance procedure permits the terminated employee to file a grievance and have a hearing by an impartial panel to determine whether the termination comported with Town policy. Stickley chose not to file a grievance.

---

[4] The Board of Inquiry is an optional internal procedure of the Strasburg police department invoked by the Chief of Police for disciplinary purposes. The purpose of the board is to review facts and allegations and to make recommendations on disciplinary matters. It is not an official procedure of the Town. When utilized, the board consists of at least three members, including the Chief, the Town Manager, and an officer from a nearby agency, as was the case here. (Strasburg Police Department Rules and Regulations 1-9.9.)

## II.

Defendants have moved for summary judgment[5] on the ground that they did not violate Stickley's First Amendment Rights. In the alternative, Sutherly and Fauber claim that even if they violated Stickley's rights, they are entitled to qualified immunity because it is, at the very least, debatable as to whether Stickley spoke on a matter of public concern rather than as an employee on a matter of personal interest. The court finds that, although Stickley's speech may have been protected, it was not so clearly protected as to put the defendants on notice that their actions were unconstitutional. Accordingly, the court holds that the individual defendants have qualified immunity and grants them summary judgment on Stickley's First Amendment claim.

"Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Campbell v. Galloway, 483 F.3d 258, 270 (4th Cir. 2007) (citations omitted). To overcome a qualified immunity defense, a plaintiff in a § 1983 case must show that the defendant's action deprived the plaintiff of a protected constitutional right, and that the right was so clearly established at the time of the transgression that a reasonable person would have been aware of it. See Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009); see also, Campbell, 483 F.3d at 271 ("A right is clearly established if the contours of the right are sufficiently clear so that

---

[5] Summary judgment is proper "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court views the evidence and makes all reasonable inferences in the light most favorable to the nonmoving party. Sempione v. Provident Bank of Md., 75 F.3d 951, 954 (4th Cir. 1996).

6

a reasonable officer would have understood . . . that his behavior violated the right.") (citations omitted). To determine whether the official should have known that his actions violated a right, the court must examine the facts "at a high level of particularity." Campbell, 483 F.3d at 271. This narrow focus is particularly crucial in First Amendment § 1983 claims, for the inquiry must focus not on whether the official should have known that it was unconstitutional to retaliate against speech generally, but rather on whether a reasonable person would have known that it was unconstitutional to retaliate against the specific speech in question. See id. It is not incumbent upon the officer "to sort out conflicting decisions or to resolve subtle or open issues," for they are "not liable for bad guesses in gray areas . . . [but only] for transgressing bright lines." Id. (quoting McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998)). In making the qualified immunity determination, the court is not constrained to resolve the first prong of the qualified immunity analysis (whether defendants in fact violated the plaintiff's constitutional rights) if the court determines that the second prong (whether the right was clearly established) is dispositive. See Pearson, 129 S.Ct. at 818. In this case, the court finds the second prong to be dispositive.

A claim of First Amendment retaliation has three elements: (1) "the public employee must have spoken as a citizen, not as an employee, on a matter of public concern;" (2) "the employee's interest in the expression at issue must have outweighed the employer's 'interest in providing effective and efficient services to the public;'" and (3) "there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 316 (4th Cir. 2006) (quoting McVey, 157 F.3d at 277). Defendants do not contend that Stickley was speaking as a governmental representative during his conversation with Rinker, nor can they seriously dispute that Stickley

7

was disciplined and ultimately terminated because of this conversation. The primary question, therefore, is whether Stickley's speech was on a matter of public concern.[6]

An employee's speech involves a matter of public concern "when it involves an issue of social, political, or other interest to a community." Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000) (en banc). This is a question of law for the court, id. at 406, that requires an examination of "the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "[C]ritical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is made primarily in the employee's role as citizen or primarily in his role as employee." Urofsky, 216 F.3d at 407 (citations omitted). In this regard, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992).

The Fourth Circuit has recognized that "it is settled that a public employee's expression of grievances concerning his own employment is not a matter of public concern." Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990) (citing Connick, 461 U.S. at 148; Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1080 (4th Cir. 1987); Daniels v. Quinn, 801 F.2d 687, 690 (4th Cir. 1986); Johnson v. Town of Elizabethtown, 800 F.2d 404, 406 (4th Cir. 1986); Lewis v. Blackburg, 759 F.2d 1171 (4th Cir. 1985) (en banc); Jurgensen v.

---

[6] Also at issue is whether Stickley's interest in the speech outweighs the police department's interest in restricting it. The court declines to reach that issue, however, as the public concern analysis provides an ample basis for finding that qualified immunity is warranted.

Fairfax County, 745 F.2d 868, 879-80 (4th Cir. 1984)). See also Campbell, 483, F.3d at 267 ("personal complaints and grievances about conditions of employment . . . cannot be considered matters of public concern") (citing Stroman, 981 F.2d at 156). The Supreme Court has reasoned that "government offices could not function if every employment decision became a constitutional matter." Connick, 461 U.S. at 143. In this case, Stickley's comments to Rinker were undoubtedly a personal grievance about a condition of employment. Sutherly had demoted Stickley, and Stickley expressed his frustrations about the situation to Rinker. If the baseline rule controls, therefore, Stickley's speech would not be considered to be on a matter of public concern.

Stickley contends, however, that this situation is unique because of the pre-existing public discussion about employment practices within the police department. He points to the newspaper articles and general discussion in the community about his demotion as evidence that this particular employment decision was a matter of public concern. On that score, the Fourth Circuit has noted that one factor in the public concern analysis is "whether 'the public or the community is likely to be truly concerned with or interested in the particular expression.'" Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004) (quoting Arvinger v. Mayor of Baltimore, 862 F.2d 75, 79 (4th Cir. 1988)). See also Mills v. Steger, 2003 WL 21089092 (4th Cir. May 14, 2003) ("One of the critical factors in determining whether speech is on public or private matters is whether it concerns matters of public debate . . . .") (citing Cooper v. Johnson, 590 F.2d 559, 562 (4th Cir. 1979)). And because the public concern inquiry is always a fact specific one, the Fourth Circuit has cautioned that "[t]o conclude . . . that a personal complaint . . . affecting only the complaining employee can *never* amount to an issue of public concern could improperly limit

the range of speech that is protected by the First Amendment." Campbell, 483 F.3d at 269 (emphasis in the original). This potential exception notwithstanding, however, when "employee grievances are more the subject-matter of the speech than matters of public interest it is the rule that a 'wide degree of deference to the employer's judgment is appropriate.'" Jurgensen, 745 F.2d at 879 (quoting Connick, 461 U.S. at 148).

Here, the fact that there was some discussion in the Town about Stickley's position makes it a close call as to whether his speech was on a matter of public concern. On the one hand, there is evidence that Stickley's conversation with Rinker was not wholly unrelated to a pre-existing public discussion. On the other hand, the facts must be considered in light of the general rule that personal grievances are usually not considered to be matters of public concern. In this case, the court need not conclusively determine whether the speech was protected, but only recognize that it was not squarely on one side or the other of an ill-defined line. This determination is illuminating for the purpose of qualified immunity.

An examination of the record and the case law shows that, in the light most favorable to Stickley, his conversation with Rinker was "in the gray area" of arguably protected speech for purposes of qualified immunity, and therefore summary judgment is warranted. The very fact that Stickley's speech is not clearly on a matter of public concern is relevant to this determination. As was the case in Campbell, "the facts of this case are close . . . to the ill-defined line between private speech and speech involving matters of public concern . . . ." Campbell, 483 F.3d at 271. Qualified immunity shields a public official for not properly discerning that his decision is on the wrong side of that line.

In summary, a consistent line of cases in this circuit underscores the general rule that employees' narrowly focused, personal, job-related grievances are not matters of public concern, see supra at 8-9, and nothing in the content of Stickley's speech seemed to position it as anything but a narrow complaint about his relationship with his superiors. Though the somewhat broader public debate about how Sutherly was handling his personnel decisions might arguably bring Sutherly's retaliation against Stickley closer to the line, that line nevertheless remains ill-defined. Qualified immunity protects officials from damage actions under § 1983 for close calls. Because "the speech at issue in this case falls within the gray area between speech that clearly is a matter of public concern and speech that clearly is *not* a matter of public concern," Campbell, 483 F.3d at 271 (emphasis in the original), Sutherly and Fauber are entitled to qualified immunity. Accordingly, the court grants them summary judgment.

### III.

The Town maintains that, irrespective of whether Sutherly terminated Stickley for speaking out on a matter of public concern, the Town is not liable because Stickley's termination was not pursuant to a Town policy or custom, a prerequisite to municipal liability under § 1983. The Court agrees and grants the Town's motion for summary judgment.[7]

Although towns and other local political subdivisions are not entitled to assert a qualified immunity defense, Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,

---

[7] In addition to naming the Town as a defendant, Stickley has also named Sutherly and Fauber as defendants in their official capacities. An official capacity claim is simply "'another way of pleading an action against an entity of which an officer is an agent.' As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n. 55 (1978)).

507 U.S. 163, 166 (1993) ("[U]nlike various government officials, municipalities do not enjoy immunity from suit-either absolute or qualified under §1983."), they "cannot be held liable under § 1983 on a *respondeat superior* theory" for the actions of their officers and employees. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Rather, to establish liability, the plaintiff must show that the execution of a policy or custom of the municipality caused the violation. Id. at 694; Riddick v. Sch. Bd. of the City of Portsmouth, 238 F.3d 518, 522 (4th Cir. 2000) ("[A] municipality may be subject to liability . . . if the alleged injury was caused by an identifiable municipal policy or custom.") (citation omitted). "Municipal liability . . . depends on whether the liability asserted is based on a municipal act and not simply on the independent act of a municipal employee, even though that employee may be acting as the final decision maker." Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. Greensboro, 64 F.3d 962, 964-65 (4th Cir. 1995). "The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 (1986). However, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Id. at 480. But "to hold a municipality liable for a single decision (or violation), the decision maker must possess 'final authority to establish municipal policy with respect to the action ordered.'" Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (quoting Pembaur, 475 U.S. at 481). See also City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality) ("[M]unicipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."). Thus, the Supreme Court's "cases on the liability of local government under § 1983 instruct us to ask whether governmental

officials are final policymakers for the local government in a particular area, or on a particular issue." McMillan v. Monroe County, Ala., 520 U.S. 781, 785 (1997). State law, in turn, supplies the answer to this question. Id. at 786.

Though "authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority," Pembaur, 475 U.S. at 483, "[w]hen a municipal official's discretionary action is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies," Riddick, 238 F.3d at 523. Consequently, when controlling state or local law subjects a municipal official's discretionary decision to further review to ensure that it conforms with the municipality's policies, that official does not have final authority with respect to that decision. See Kirby, 388 F.3d at 451 (police chief "lacked final authority" with regard to decision to demote employee "because the decision was subject to further review by the City's Personnel Appeals Committee and City Manager"). In contrast, "if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because the decision is final." Praprotnik, 485 U.S. at 127 (plurality).

To determine whether Sutherly or Fauber possess the requisite final policymaking authority, the court looks to the relevant provisions of the Virginia Code, the Town Charter, and the Town Code.[8] Virginia Code § 15.2-1100 provides that "[a]ll powers vested in a municipal corporation . . . shall be exercised by its governing body." The Town Council is the Town's governing body, and it alone has the authority to establish Town policy. The Town's Code

---

[8] The court takes judicial notice of the Virginia Code, Town Charter and Town Code.

13

provides that the Chief of Police "shall always be subject to the orders and regulations of the town manager . . . [and] under control of the town manager . . . ." (Strasburg Code Sec. 50-57(a)). The Town Manager, *"subject to the consent of the council,"* may appoint, remove or discharge "such officers, employees and assistants as may be necessary to carry on the work" of the Town, and whose "action in all respects shall be subject to review by the council . . . ." (Strasburg Code § 2-157(d)) (emphasis added). Section 15.2-1506 of the Virginia Code requires localities, such as the Town, to establish grievance procedures for their employees. Those grievance procedures must conform to the requirements of Virginia Code § 15.2-1507. The Town Council has formally adopted a personnel policy manual through the Town Code (Strasburg Code § 62-1), including a grievance procedure which the parties agree conforms to the Virginia Code's requirements and was available to Stickley. The grievance procedure has three steps, and the final step is a hearing before a three-member panel which must *"ensure the proper application of town policies and procedures."* (Grievance Procedure 31) (emphasis added).[9] Stickley did not file a grievance to challenge Sutherly decision to terminate him.

Against this legal backdrop, Stickley is hard-pressed to identify a final decision by a policymaker causing his termination. Instead, as proof that Sutherly had final policymaking authority, Stickley relies on a job description adopted by the Town's police department (by Sutherly's predecessor) as part of the department's policy manual which provides that the Chief of Police has "final authority in all matters of policy operations and discipline." (Stickley Response

---

[9] The grievant selects one member, the Town Manager selects a second, and those two panel members select a third (who will serve as the panel chairperson) or if they cannot agree the Circuit Court selects the third. Persons involved in the grievance, in direct line of supervision of the grievant, relatives, and other interested parties cannot serve as panel members.

14

to Summary Judgment at 19.) That reliance, however, is misplaced for at least two reasons. First, as Stickley concedes, the police department's policy manual "was not adopted, ratified, or amended by the Strasburg Town Council." (Joint Stipulation at ¶ 3.) Therefore, it is not the Town's policy, and the Town has final authority under state law to establish municipal policy with respect to the action Sutherly ordered. Second, controlling state and local law subjects Sutherly's as well as Fauber's discretionary personnel decisions, like the decision to terminate Stickley, to further review to ensure that those decisions conform with the Town's policies. Consequently, in addition to not having policymaking authority in relation to their decisions regarding Stickley's termination, neither Sutherly nor Fauber had the "final authority" necessary to hold a municipality liable for any single termination. See Kirby, 338 F.3d at 451.

This conclusion is consistent with the Supreme Court's view in Pembaur. In a hypothetical strikingly similar to the facts of this case, the Court noted:

> [T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

Pembaur, 475 U.S. at 484 n. 12 (emphasis in the original).

Because the Town reserved to itself the right to make final policy concerning personnel matters without delegating that authority to either Sutherly or Fauber, and because Sutherly's

personnel decisions were subject to review through the grievance procedure to ensure their conformity with the Town's policy, the court finds that neither Sutherly nor Fauber possess final policymaking authority. Accordingly, the Town cannot be held liable for their actions in this matter, and the court grants summary judgment.

## IV.

For the reasons stated, the court will grant defendants' motion for summary judgment.

**Enter**: This 30th day of October, 2009.

_____
UNITED STATES DISTRICT JUDGE